113 So.2d 153

Albert FULLER, alias Albert F. Fuller,

v.

STATE of Alabama.

6 Div. 917.

Supreme Court of Alabama.

Feb. 12, 1959.

Rehearing Denied June 25, 1959.

Beddow, Gwin & Embry, Beddow & Jones, Roderick Beddow, Robt. W. Gwin, Roderick Beddow, Jr., Birmingham, and V. Cecil Curtis, Phenix City, for appellant.

John Patterson, Atty. Gen., and Bernard F. Sykes, MacDonald Gallion, Geo. Young and Jas. Webb, Asst. Attys. Gen., for State.

LIVINGSTON, Chief Justice.

The appellant, Albert Fuller, was indicted on December 9, 1954, by the Grand Jury of Russell County, Alabama, on a charge that he unlawfully, and with malice aforethought, killed Albert L. Patterson by shooting him with a gun or pistol against the peace and dignity of the State of Alabama.

On January 27, 1955, the appellant filed a petition in the Circuit Court of Russell County, Alabama, requesting a change of venue. On the same date, Honorable J. Russell McElroy, Circuit Judge, granted the change of venue and ordered the trial of the case removed to the Tenth Judicial Circuit of Alabama; and on the same day the appellant was arraigned in the Circuit Court of Russell County, Alabama, and entered a plea of not guilty. Thereafter, on January 31, 1955, the appellant was arraigned in the Circuit Court of the Tenth Judicial Circuit of Alabama, and entered a plea of not guilty. The cause was set for trial on February 14, 1955, and upon being called for trial on February 14, 1955, it was continued until February 15, 1955, and on which latter date the trial began and continued for approximately four weeks. On March 11, 1955, the jury returned a verdict of guilty of murder in the first degree and fixed Fuller's punishment at life imprisonment in the penitentiary.

A motion for a new trial was filed on April 11, 1955, and regularly continued several times. On June 6, 1955, an amendment to the motion for a new trial was filed. The motion for the new trial, as amended, was heard on June 13, 1955 and overruled on June 16, 1955.

Fuller was sentenced in accordance with the verdict of the jury, and he appealed.

The appellant argues eight propositions of law for a reversal of the cause, and we will treat them in the order in which they are argued in appellant's brief. But before proceeding to discussion of the several propositions argued, and for a clearer understanding of this opinion, we think it not amiss to here state some of the background and uncontradicted facts in the case.

Albert L. Patterson, long a resident citizen of Phenix City, Russell County, Alabama, was the Democratic nominee for the office of Attorney General of the State of Alabama in the May 1954 Democratic Primary Election.

He was killed on the night of June 18, 1954, at about 9:00 o'clock p. m. Patterson's office was on the second floor of the Coulter Building in downtown Phenix City, Alabama. On the night that he was killed, his automobile was parked in an alley beside the Coulter Building. Patterson had left his office about 9:00 o'clock and proceeded to his automobile, and had apparently gotten in it. He was shot, after which he apparently got out of the car and walked around in front of the Coulter Building where he collapsed on the sidewalk and died.

The appellant, Albert Fuller, and two others were indicted, separately, by the Grand Jury of Russell County, Alabama, for murder in the first degree as a result of Patterson's death. Albert Fuller was at the time of Patterson's death the Chief Deputy Sheriff of Russell County, Alabama.

The case of this appellant and Arch Ferrell, one of the other accused in Patterson's death, was set for trial in Jefferson County on the 14th day of February 1955, but was, on that date, continued to February 15, 1955. One venire was drawn and

**318**

summoned for the trial of both cases. The jury was drawn, summoned and impaneled under the provisions of Title 62, Sec. 196 et seq., Code of 1940, which is a local jury law applicable to Jefferson County, Alabama.

### Appellant's Proposition No. I

■ "The court erred in making a statement to the venire from which the jury was selected to try appellant's case which intimidated and over-reached the members of the venire to such an extent as to deprive the appellant of a fair and impartial trial."

For better understanding and before quoting the statement in question, we here state some of the circumstances surrounding its making.

On February 14, 1955, at which time the state had not indicated whether they would try the appellant first or Arch Ferrell, one of the other accused, whose trial was set for the same date, Presiding Judge Russell McElroy proceeded to hear excuses of veniremen, such as sickness, disqualification, and other claims of exemptions from jury duty. Before hearing said excuses, the court stated:

"For whatever possible value any exception on the part of any party to any case, to the court's excusing, or the court's refusal to excuse a juror, may have, it is ordered by the court that the State of Alabama and each of the defendants, Ferrell and Fuller, do automatically have an exception to any ruling or decision of the court made in the course of the organization of these jurors; and that it shall not be necessary that the State or any of said defendants expressly express that they or any of them take any exception to any such decision or ruling of the Court."

The trial court then proceeded to hear the excuses of the veniremen in reference to both cases set for trial that day, that of appellant, Fuller, and the other accused, Ferrell. Subsequently, and after the State of Alabama had announced ready and had elected to try Albert Fuller first instead of Ferrell, the other accused whose case was set for the same date, the trial court, by way of explanation, made the following statement to the veniremen:

"The Court will propound to you certain questions, gentlemen. It is your duty as a citizen of this republic to make sincere answers to those questions, and not to make insincere or false answers. That would be true with reference to any question that the judge might propound to you, as well as also in making your reply to any question propounded to you by a lawyer in the case that has to do with any bias or prejudice or sympathy, or things of that sort, any question that the Court might allow.

"If you are made out of tissue paper, we would like to know it right now. If you are not willing to perform a duty as a juror, you don't consider that among the duties of a citizen of this country, if you want to discharge it, if you are full of fire, if you are made, or feel by your convictions before you have heard the evidence, whether your convictions should tell you there should be a verdict of guilty —verdict of acquittal, we would like to know it.

"The Court is going to ask you certain questions. As I say, the Court— you are under a legal duty to make sincere answers to those questions, and not to shape your answers so as to render you subject to a challenge for cause for that purpose."

The trial court then proceeded to question the jurors concerning their residence, citizenship, indictments for a felony, relationship to defendant and to the deceased, and circumstantial evidence; whether or not veniremen had made any promises or given any assurance of a conviction or an acquittal. The trial court

then made the following statement which is the basis for appellant's Proposition No. 1:

"Now, the next question, gentlemen, that the court is going to ask you, I am going to tell you what it is, and I am going to explain it to you. It is going to be this: do you have a fixed opinion as to the guilt or innocence of the defendant that would bias your verdict in the case?

"Well, if you have lived, and you have, since June 18, 1954, by—shared the ordinary fortunes of life that come to adult persons, you, of course, have read a lot of things in the papers, and you have heard a lot of talk, none of which would be evidence here.

"A person that hears anything at all about a matter begins having some kind of an opinion. *If you have any sense*, you can't help but have some kind of opinion about anything, about the Formosa situation, or about how the foreign affairs of this country are generally being conducted. If you also have any further sense, you know that your capacity to judge is limited by reason of the lack of information. It is impossible for the whole picture, the problem facing the Secretary of State and the President of being made as clear to you as it is to them.

"Well, we will go back just a minute to the Sheppard trial [State v. Sheppard, 165 Ohio St. 293, 135 N.E.2d 340] that took place up in Cleveland, Ohio. That was tried. There were two trials of that case. One was in the court room, and the other was—back before what we call the great bar of public opinion that did not hear the evidence in the case. Have you a judgment about that? A lot of people say, well, I don't think they proved him guilty, and a lot say I think they proved him guilty. Do you know who is a better judge of that than you? The folk that sat there and heard the evidence. That is true in any case,

and that is true whether the verdict is a verdict of guilty, or a verdict of acquittal.

"*Now, a fixed opinion, gentlemen, means a buttheaded opinion; it means a stubbornness that refused to be governed by testimony of witnesses who swear they have personal knowledge. It means the kind of buttheadedness that you would find in a man with a head the shape of a baseball. Don't ever try to argue with him. He has an opinion on everything, and if God could speak out of heaven to him, it would have no effect on his opinion.*

"A fixed opinion means—if you say you have a fixed opinion, it means you are willing to go on information the authenticity and the accuracy of which you have no knowledge, instead of going by the testimony of human beings who come here and swear that they are telling the truth.

"With that explanation, gentlemen, I am going to ask you now,—I have tried to tell you and give you my sincere view, and it may be that there are those among you who do have a fixed opinion as to the guilt or innocence of the defendant that would bias your verdict in the case, and keep you from serving as a juror in this case with an open mind, and *I have not meant to say beforehand anything that would make a man ashamed. If you have a fixed opinion, you will be dealt with respectfully, and you will have to be excused.*

"Now, I ask you, gentlemen, do any of you have a fixed opinion as to the guilt or innocence of the defendant that would bias your verdict in this case? If you do, say so, we would like to know it."

"(No response)." (Emphasis supplied by appellant's counsel.)

To the foregoing statement, appellant made no objection whatever.

The court then proceeded to qualify the jury as to a fixed opinion against capital punishment. Several jurors indicated that they had fixed opinion against capital punishment and were excused after being challenged for cause by the State of Alabama. During this part of the proceedings, the trial court stated:

"I might say, gentlemen, that I shall order that either side, in a ruling made on challenge for cause, or any questions or rulings on objections to questions that might be propounded to the jurymen, any statement heretofore made by the court, that each party to this lawsuit shall have an exception thereto automatically."

After the jurors, who had been challenged for cause on account of their views on capital punishment, and the challenge sustained, were excused, the following proceedings were had:

"The Court: I should like to have a very, very short conference with all counsel in, we will say, the East witness room of Judge Wheeler's, right now, for just a short spell. (Whereupon the court, counsel and the reporter retired to the side room, where the following proceedings were had and done out of the presence and hearing of the jury venire.)

"The Court: Was there anything said that any exception should be taken to?

"Mr. Deason: I have no exception whatever.

"The Court: Do you have any exception to anything I have said? I am asking you off the record, do you feel like there was any remarks made by the court that I should correct?"

Appellant's attorney made no reply to this inquiry.

Subsequent to the proceedings outlined above, counsel for both the appellant and the state were given ample opportunity to question veniremen touching their qualifications, bias, sympathy, interest, feeling, and opinions. In so doing, the trial court stated to the jurors:

"The Court: Gentlemen, the counsel in this case have the right under the law to ask you questions touching upon your qualifications, bias, sympathy, interest, feeling, opinion, or anything of that sort, of and concerning this case, and when they ask you questions they are doing it for the purpose of not being offensive or impertinent to you, or conducting an imposition on you, but purely for the explorative purpose of finding out something. They want to ask you some questions that they consider pertinent to your feelings, if any you have, with reference to this case, and you should consider it as being made in a professional spirit and not in any spirit of antagonism toward you. That is true whether the questions are asked by counsel for the state or counsel for defendant in this case.

"Gentlemen, again, you should make a sincere and truthful answer to the questions, and if you are asked a question or you feel like you don't know exactly, or think about the question enough to be certain that you are giving a correct answer, if you are asked a question and you don't know, there is no reflection on you to say, "I don't know." If you don't know a particular matter that might be asked you, it is your duty to say that. That would be a true answer. Every man is due to answer for himself, not to follow somebody else's answer because they appeal to you as being proper and impressive answers and good answers."

Thereafter, counsel for appellant was given a full opportunity to question veniremen concerning their qualifications, including whether or not said veniremen had a fixed opinion. Counsel for appellant availed himself of this opportunity by examining the veniremen in panels of 12 men.

Illustrative of counsel's examination of veniremen concerning whether or not they had a fixed opinion is the following excerpt from the record, after a prospective juryman had stated that he had read many newspapers concerning the "Phenix City situation":

"Now, Mr. Beard, in your opinion, of course, you read many things that had nothing to do with the slaying of Mr. Albert Patterson. You probably read of other matters connected with the Phenix City situation that didn't touch or have anything to do with the Patterson slaying, but now from what you have read, and from what you have seen in the newspapers, and from what you heard, if you have heard anything with regard to a discussion of the items of news that you saw and read in the papers, that you made almost continuous perusals of, would you say that your opinion has in any way been affected with regard to the guilt or the innocence of Albert Fuller?

"Mr. Beard: No, Sir.

"Mr. Beddow: Mr. Beard, this is an important question, and I know you will answer it accurately.

"This gentleman sitting right over there is Albert Fuller, the young man in the brown suit. Do you have any opinion, or do you have any fixed conclusion with regard to his guilt or innocence at this time?

"Mr. Beard: No, Sir."

Counsel for appellant also questioned this juror and the other veniremen concerning whether or not they would act solely upon the evidence presented on trial, and questioned the veniremen concerning reasonable doubt.

Further illustrative of appellant's questioning jurors concerning their fixed opinion, the record shows as follows:

"Have either of you gentlemen, and his Honor wants you to speak up, and I do, and don't be timid about it, have either one of you gentlemen read anything, or have you heard anything by way of discussion or just conversation like people will have in the streets, or in a man's home, or on the job, have either one of you heard anything said, or have you read anything that would influence your verdict, or influence you in rendering a verdict against Albert Fuller in this case as contradistinguished from what you would do if you were acting upon the testimony? Do either of you 36 gentlemen know any reason in the world, irrespective of what it might be, and I will ask you again not to be *timied* because you men have characteristics that sometimes persuade you to believe things, but do either one of you know anything in the world that has occurred since the date of the 18th day of June of 1954 that you believe would influence you in rendering a verdict in this case?"

After the foregoing proceedings were had, it appears that counsel for the state and for the appellant proceeded to strike the jury without any motion by appellant and without any objections by appellant to strike from the list furnished, nor was there any motion by the appellant to quash the venire or for a mistrial, and appellant challenged no venireman for cause.

Counsel for appellant raises the question now under discussion for the first time on his motion for a new trial. Nowhere in the record is attempt made to show that any member of the jury which tried appellant, or any member of the venire from which the jury was selected, had a fixed opinion as to guilt or innocence of the defendant. The argument is made that the trial court's remarks were of such a nature as to overawe or intimidate the members of the venire, including the jury impaneled to try defendant, to the extent that they were prevented from indicating that they had a fixed opinion as to the guilt or innocence of the defendant; that the defendant was thereby deprived of trial by a fair

and impartial jury as guaranteed him by the Constitution of the State of Alabama, § 6, and the Constitution of the United States, Amend. 14.

We cannot agree with this insistence for several reasons.

We have carefully examined the cases relied on by appellant to support his Proposition of Law No. I and find them inept.

In the first place, after a careful consideration of the remarks of the trial judge, we are not persuaded that his explanation of a fixed opinion was calculated to so intimidate or overawe the veniremen as to deter them from stating that they had a fixed opinion if they had one. In Willingham v. State, 262 Ala. 550, 80 So.2d 280, 282, we said:

"Our statute, Code of 1940, Title 30, § 55(7) reads:

"'It is a good ground for challenge by either party: * * * 7. That he has a fixed opinion as to the guilt or innocence of the defendant, which would bias his verdict.'

"And § 56, Title 30, provides that this ground is proved 'by the oath of the person alone'.

"In Peterson v. State, 227 Ala. 361, 150 So. 156, 159, certiorari denied 291 U.S. 661, 54 S.Ct. 439, 78 L.Ed. 1053, the court said:

"'What is said in Long v. State, 86 Ala. 36, 5 So. 443, 447, finds application here:

"'"While some of the expressions in the opinions may not be sufficiently limited or qualified for use as a general definition, the following may be deduced from the cases, when compared with each other, as expressing the meaning of a fixed opinion which would bias the verdict. The mere formation of an opinion, founded on rumor or hearsay, which is subject to change on hearing the evidence, and leaves the mind of the juror free to impartially consider the whole evidence, without giving undue credence to that which tends to prove the facts as heard, and to apply to the evidence the law as pronounced by the court, is not sufficient to disqualify. But an opinion, whether founded on rumor or conversations with witnesses, or on observation, which is a conviction, a prejudgment, disqualifying the juror to impartially consider the whole evidence,—that which tends to prove the facts as heard, as well as that which contradicts or explains,—and to apply free from bias the law as given in charge by the court, is a fixed opinion which will bias the verdict. The mind of the juror should be in such a state of freedom, that he is capable of giving to the accused the weight of the presumption of innocence, and the benefit of a reasonable doubt. The statute affirms, in concise, intelligible, and comprehensive language, the common-law rule, as declared by Chief Justice Marshall in Burr's trial. 'That light impressions, which may fairly be supposed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of that testimony, constitute no sufficient objection to a juror; but those strong and deep impressions, which will close the mind against the testimony that may be offered in opposition to them, which will combat that testimony, and resist its force, do constitute a sufficient objection to him.'

"'"The sufficiency of the cause of challenge is determined by the trial court, and the inquiries are addressed to the conscience of the juror under oath. He is examined touching his qualifications, in the presence of the judge, who sees his manner of answering the questions, and the probing of his conscience, which is often times more clearly indicative of his disinterestedness or bias, than the mere words used. The reviewing court,

therefore, should exercise caution, and the finding of the trial court should not be set aside, unless it affirmatively appears, that, on the answers of the juror, taken as a whole, he entertained a fixed opinion which would bias his verdict." ' "

■■ We think it clear that the criterion for deciding whether a juror is disqualified by reason of a fixed opinion depends upon the extent, the degree, or the deepness of his impression. If the deepness of the impressions is such as to close the mind of the juror, he should be disqualified. A fixed opinion which would bias the verdict is a conviction or prejudgment, a strong or deep impression which closes the mind of the juror and combats the testimony and resists its force.

The theme of the trial court's explanation to the jury was that a jury should act alone on testimony of sworn witnesses and should not be influenced in any manner by any preconceived ideas or opinions whether those ideas or opinions were derived from newspaper accounts or otherwise. He described a fixed opinion as a buttheaded opinion characterized by a stubbornness that refused to be governed by testimony of witnesses who swore to have personal knowledge. The trial court not only explained to the jury the meaning of a "light impression" and a "mere opinion," but at the same time he also followed the definition set out in Willingham v. State, supra, and merely pointed out to the jurors in words that they could understand and in common, ordinary, everyday language the meaning of a deep impression or an unyielding opinion.

According to Webster's New International Dictionary, 2d Edition, buttheaded means "obstinate," while stubborn means "fixed, resolute, or unyielding; inflexible; especially unreasonably unyielding, obstinate."

Although not used in the same context as here used the words "stubborn" or "ob-

stinate" or "buttheaded" have not been held to be forbidden in addressing jurors or veniremen. These words have been used in cases where jurors seem somewhat reluctant to agree on a verdict in criminal cases.

In Odette v. State, 90 Wis. 258, 62 N.W. 1054, 1055, the trial judge urged a jury not to stand out in an "unruly and obstinate way." This was held not to be reversible error.

It was stated in People v. Faber, 199 N.Y. 256, 92 N.E. 674, 676, that jurors may be properly warned "against stubbornness and self-assertion."

In Shaffman v. United States, 3 Cir., 289 F. 370, 374, it was held not error for the court to admonish jurymen of their duty not to be persuaded by obstinate adherence to earlier impressions formed in the jurors' minds. The trial court had said to the jury:

"* * * a dogged persistence in a position which will not listen to a fair argument, or to the persuasive force of reason, is destructive of justice, and has no place in the jury box."

In Johnson v. State, 60 Ark. 45, 28 S.W. 792, 793, it was held not error to admonish the jury not to "be obstinate or too tenacious of your views," and the appellate court said this meant to the jurors that they should not be "stubborn."

In Benson v. State, 149 Ark. 633, 233 S.W. 758, 760, it was held that the trial court did not commit error in saying to the jury "sometimes we find a juryman, or anybody else in life, that says a horse is sixteen feet high, and they want to stand by it, right or wrong. It shows good judgment for a juryman to listen to his fellow jurors in giving their opinion."

In Golatt v. State, 130 Ga. 18, 60 S.E. 107, the appellate court held that the trial court did not commit reversible error when the jury that fails to agree is told that no juror should "stick out" in the spirit of

stubbornness. The Ohio Supreme Court in Liska v. State, 115 Ohio St. 283, 152 N.E. 667, 668, held that it was not reversible error for the trial judge to admonish the members of a jury "not to act from stubbornness alone."

So that in many jurisdictions, the words "stubbornness," "obstinate," and synonyms of "buttheaded" have been used to describe jurors without the appellate court considering that a juror was ridiculed or deterred from expressing a free opinion.

Looking to other parts of the record, it is quite clear that the veniremen in this case did speak out freely when the court was hearing excuses from service. Jurors also spoke out when they were interrogated concerning their feelings about capital punishment after the court had explained the meaning of "fixed opinion against capital punishment." Several jurors were not so deterred that they refused to express their opinions with fear of ridicule. So, also, upon examination by counsel for the defendant the veniremen were fully questioned concerning their opinions.

Perhaps the most convincing argument that there is no likelihood that any venireman had a fixed opinion that would bias his verdict but failed to state it, is the fact that able and experienced counsel for the appellant proceeded to strike from the panel without any objection whatsoever. He was not forced or coerced to do so, and at the time was evidently satisfied with the qualifications of the veniremen.

■ In the second place, it was not error for the court to inquire of the veniremen if they or any of them had a fixed opinion as to the guilt or innocence of the accused. Indeed, it was his duty to do so. If the manner in which the court conducted such inquiry resulted in prejudicial error to the accused, it is his duty to show such error. It cannot be presumed. Kabase v. State, 31 Ala.App. 77, 12 So.2d 758, certiorari denied 244 Ala. 182, 12 So.2d 766. See Title 30, Secs. 6 and 55, Code of 1940; see, also, Sec. 6, Constitution of Alabama

1901. Our cases are legion to the effect that the burden is on the party alleging error to show it affirmatively by the record. See Ala.Digest, Appeal and Error, ☞901 et seq. The presumption is that the case was tried by an impartial jury. Gayle v. Court of County Com'rs, 155 Ala. 204, 46 So. 261.

We are not unmindful of that line of cases which hold in effect that the jury, in their deliberations, should be uninfluenced by misconduct that might have influenced them and might have affected the verdict that was rendered. In those cases, the test of vitiating influence is not that it did influence a member of the jury to act without the evidence, but that it might have unlawfully influenced that juror and others with whom he deliberated, and might have unlawfully influenced the verdict rendered. Roan v. State, 225 Ala. 428, 143 So. 454, and cases there cited. Here, it is not contended that the remarks of the trial court influenced the jury's verdict one way or the other, as, indeed, it could not have had such influence.

■ We are cited to no case, nor has our research revealed one, deciding the exact question here presented. It is analogous to several different situations. First, it is analogous to the court's oral charge to the jury in a criminal case. If parts of the charge are objectionable, it is incumbent upon the defendant to specifically point out the objectionable parts and to reserve an exception to the trial court's failure or refusal to correct it. See Kelley v. State, 226 Ala, 80, 145 So. 816, and cases therein cited, and also 6A Ala.Dig., Criminal Law, ☞844(1).

Another analogous situation arose in the case of Haygood v. State, 252 Ala. 3, 38 So.2d 593, 596, where the court explained the purpose of requiring objection and exception to the remarks of the court before a review is obtainable here. In that case, the appellant complained on appeal of the manner in which a witness was questioned by the court, specifically that the court's

manner of questioning implied the guilt of the defendant on trial. The Court there stated:

"The purpose of objection and exception is to challenge the correctness of the action of the court so that such action may be corrected by the court itself, if deemed erroneous, and to lay the foundation for review, if necessary, by the appellate tribunal. Without such objection and exception, the trial court ordinarily has the right to assume that its action is acquiesced in and free from error."

In the instant case, the trial judge specifically inquired of counsel as to whether or not they had any exception to his remarks. Counsel for the state replied that he had none; counsel for the appellant made no reply whatever. We have noted above that the trial court gave to the parties in this cause what is termed an "automatic exception." The "automatic exception" was given before the trial court asked counsel for defendant if he had any corrections he wanted made and subsequent to the remarks now complained of. In response to the invitation by the court, counsel said nothing, but proceeded later to examine the jurors concerning their fixed opinions and other matters, and then proceeded to strike from the list or panel without any objections whatsoever. Under the circumstances of this case, the trial court had the right to assume that its definition of the fixed opinion was acquiesced in by the appellant and was free from error.

In Thomas v. State, 150 Ala. 31, 43 So. 371, 377, this Court said:

"It is a proposition, recognized by all the courts, 'that questions not presented in the trial court in some appropriate manner will not be considered on appeal or error. It is a rule of nearly universal application that objections must be made in the trial court in order to reserve questions for review.' * * * Again, the defendant was aware of the absence of the judge, and so was his counsel, but raised no objection. The judge returned, and the trial proceeded to conviction, judgment, and sentence without any question being raised. The defendant knew as well when the judge left the bench and at the time he returned as he did when he presented in his bill of exceptions the point of law that he now urges as a ground for reversal, and yet he said nothing about the point when the judge returned, but chose rather to remain silent and take the chances of getting a favorable verdict from the jury; and so of his own fault is his point in nonreviewable shape."

In the case of Page v. Hawk, 250 Ala. 26, 33 So.2d 8, 11, the appellant contended for a reversal because of two remarks made by the trial court during the progress of the trial. This Court there said:

"No objection was made at the time by plaintiff. No exception was reserved. No motion was made to have the jury charged to disregard such remarks nor was a motion made to withdraw the case from the jury and declare a mistrial.

"If the plaintiff deemed the remarks prejudicial, she should have invoked action of the court thereon. She cannot be allowed to speculate upon a favorable verdict, and failing therein, have the cause reversed. No reversible error appears in this connection."

Cases which we have alluded to above are not, it is true, directly in point, but we think they serve as a perfect analogy and their reasoning applies with equal force in respect to statements concerning fixed opinions made by the trial court in the impaneling of a jury. Strength is added to the above when we consider, regardless of an automatic exception, the fact that the defendant later without protestation, objection or exception of any kind whatsoever, struck the jury that tried the defendant from the panel given him. Wilson v.

State, 243 Ala. 1, 8 So.2d 422, 429. The striking of the jury did not involve excusing jurors, did not involve challenges for cause, did not involve the organization of the venire, nor any other such matter where counsel may contend that he had an automatic exception, but only involved the selection of the jury for the trial of the case. In the Wilson case, supra, in regard to a juror's qualifications or disqualifications in order that such question may be reviewed on appeal, this Court said:

"A juror's disqualification may be raised by a due challenge to the venire or by an objection to striking from the list of jurors furnished the defendant and from which the jury was to be selected, using the required method of striking the name from said list of jurors."

In Draper v. State, 250 Ala. 679, 36 So. 2d 73, this Court said:

"The defendant objected to being required to strike from the venire without the presence of Woodruff. The trial court ruled adversely to defendant, who duly reserved an exception to such action. Defendant then moved that the cause be continued because of the absence of Woodruff. This motion was overruled and again the defendant reserved an exception. This shows that the question as to the legality of the court's action in excusing the juror Woodruff is properly presented to this court."

Again in Taylor v. State, 249 Ala. 130, 30 So.2d 256, 261, this Court said:

"And even excusing veniremen before the date of trial is not reversible error in the absence of objection to selection of jury because of this excuse. * * * There is no such objection, nor was there objection to going to trial because of the matter of which complaint is now made."

■ But appellant contends that because of the remarks of the trial court

and the results of such remarks, he has been denied a fair trial by an impartial jury as guaranteed by the Constitution of the State of Alabama and the United States. But even constitutional rights have to be raised seasonably in the trial court. Gibbs v. State, 7 Ala.App. 30, 60 So. 999; Scott v. State, 247 Ala. 62, 22 So.2d 529, and Ball v. State, 252 Ala. 686, 42 So.2d 626, 631, certiorari denied 339 U.S. 929, 70 S.Ct. 625, 94 L.Ed. 1350. Quoting from the Ball case, we said:

"So, also, that objections going to the venire of the petit jury or any member thereof, must be made before entering upon the trial of the case on its merits under the defendant's plea of not guilty, and a failure to make such objections constitutes a waiver. Peterson v. State, 227 Ala. 361, 150 So. 156. This rule has its exceptions as when the defendant is misled by the false oath and fraud of a venireman, and thereby induced to accept such venireman on the jury. * * *

"It is not permissible for the defendant, who has not been so misled, to participate in the selection of the jury without objections, speculate on winning a favorable verdict, and failing to do so, allow him to raise such questions on a motion for new trial."

Appellant's Proposition of Law No. II

■ "The court erred in denying the appellant a new trial after conclusive proof was offered by the appellant that pertinent, relevant and competent evidence known to one Arch Ferrell was not available to the appellant during the progress of appellant's trial; but said unavailable evidence is now and will in the future be available if a new trial is granted to appellant."

This insistence of appellant is based on substantially the following facts:

As before stated, three individuals; namely, Albert Fuller, Arch Ferrell and

Silas Coma Garrett, III, were indicted separately for the murder of Albert L. Patterson. The cases against Fuller and Ferrell were set for trial at Birmingham on February 14, 1955, Garrett, at that time, being in a hospital in Texas. The state elected to try the case against Albert Fuller first. Three state witnesses placed Albert Fuller at or near the scene of the homicide at the time Patterson was killed. Two of these witnesses placed both Arch Ferrell and Albert Fuller at the scene of the homicide at the time Patterson was killed. The three witnesses placed Albert Fuller at a point near the scene of the homicide within a few seconds after Patterson was killed.

At the time the appellant's motion for a new trial was pending, Arch Ferrell was tried in the Circuit Court of the Tenth Judicial Circuit of Alabama for the death of Patterson, and was acquitted by the jury. Appellant then amended his motion for a new trial on the ground that the said Arch Ferrell was indicted for the same identical offense as that charged against him, appellant Fuller, and that the testimony of said Arch Ferrell was not available to the defendant, Albert Fuller, at the time of his trial, but would be available to said defendant on a new trial. It is alleged, in substance, in said amended motion for a new trial that counsel for Fuller requested the said Arch Ferrell, through his attorney, that he testify in behalf of defendant, that said attorney refused to let Arch Ferrell testify. It is further averred that since the verdict in the Fuller case, Ferrell was tried and acquitted by another jury; that Ferrell's testimony is now available to the appellant. In support of the amendment of appellant's motion for new trial, an affidavit of Ferrell was attached thereto. In substance, the affidavit of Ferrell states the manner in which Ferrell arrived in downtown Phenix City on the night Patterson was killed. Affiant, Ferrell, further deposes that he was on the telephone in his office at the Russell County courthouse from 8:53 p. m. E.S.T., continuously until approximately 9:15 p. m., E.S.T., which covers the period of time during which the killing of Patterson occurred. The affidavit further states that Ferrell did not see Fuller at any time during the night of June 18, 1954, the night of the killing, prior to the time Patterson was killed. Affiant further denies the testimony of a witness to the effect that immediately after the shots were fired, the witness observed Ferrell running from a point behind the Phenix City Post Office along 5th Avenue and 14th Street, and stopping at the flagpole located near the Phenix City Post Office. Affiant, Ferrell, further denies testimony of a witness to the effect that at the time the shots were fired, he, the witness, observed Fuller, and "in his best judgment," Ferrell standing beside the Patterson automobile, and that Fuller and Ferrell ran from the scene. Affiant, Ferrell, further denies that he was standing with Albert Fuller in front of the Coulter Building at approximately 8:50, E.S.T., as testified to by another state witness.

The affidavit of Ferrell further includes a statement that the time Albert Fuller was tried "he was not available to him as a witness." The reason for his not being available, as stated in the affidavit, was that his attorneys instructed him not to take the stand in the Fuller case, and that he, Ferrell, followed their advice. Ferrell further states that he was not present with Fuller at the time the shots were fired, as testified to by a state witness.

It is to be noted that the affidavit of Ferrell does not state why Ferrell refused to appear as a witness for Fuller except upon advice of counsel. He does not claim, and has not claimed privilege against self-incrimination, nor any common law or statutory incompetency.

At the hearing on the motion for a new trial, one of the attorneys for Ferrell, Honorable George Rogers, testified in substance that he collaborated with the attorneys for Fuller in preparation of both the Fuller case and the Ferrell case; that during the Fuller trial, Ferrell was in the jurisdiction of the Jefferson County Circuit

Court. It also appears that Mr. Beddow inquired of Mr. Rogers as follows:

"Q. During that trial did Mr. Gwin and Mr. Gwin and Mr. Roderick Beddow, Jr. and I request you in the presence of Mr. Ferrell to permit Mr. Ferrell to testify as a witness for Albert Fuller during the course of that trial?

"Mr. Deason: We object to that, if your Honor please.

"The Court: Overrule.

"Mr. Deason: The record doesn't show Mr. Ferrell was summonsed as a witness.

"Mr. Beddow: The record doesn't show a lot of their witnesses were summonsed that they slipped in without letting us know about it.

"The Court: You may answer the question.

"A. Mr. Beddow, my recollection is you discussed that with me on two or three different occasions and asked me if I would allow him to testify, my representing him, and the last occasion I recall you discussed it with me was on the Sunday afternoon before the trial started Monday. At that time we were discussing it in your library and I told you if we went out first I would not call Albert Fuller to testify, and that if you were to call Arch Ferrell I would have to refuse to let him testify because he had these two cases pending. That is my recollection about it."

Testimony of Ferrell's counsel shows that counsel intended not to allow him to testify, but the reason therefor is not stated, but the record is clear, however, that there was no subpoena issued by Fuller to require Ferrell to attend his trial, and Ferrell was not put on the witness stand in the Fuller case.

This question also appears to be one of first impression in this jurisdiction.

Counsel for appellant in brief make the following statement:

"We respectfully submit that due to the fact that the testimony of Arch Ferrell was unavailable to Albert Fuller, its submission should be regarded in the same manner as if it were newly discovered evidence."

As to newly discovered evidence, we said in the case of Taylor v. State, 266 Ala. 618, 97 So.2d 802, 804:

"To establish his right to a new trial on the ground of newly discovered evidence the defendant must meet the following requirements: (1) That the evidence is such as will probably change the result if a new trial is granted; (2) that it has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching. Washington v. State, 259 Ala. 104, 107, 65 So.2d 704; O'Pryor v. State, 237 Ala. 13, 185 So. 374; Hodge v. State, 32 Ala.App. 283, 286, 26 So. 2d 274, certiorari denied 248 Ala. 73, 26 So.2d 278; Folmar v. State, 22 Ala. App. 317, 116 So. 110, certiorari denied 217 Ala. 410, 116 So. 112; 39 Am.Jur., New Trial, § 158, p. 165."

In other jurisdictions where this question has been presented, it has been treated, more or less, under the rules applying to newly discovered evidence, and appellant has asked us to so treat it here. We will do so.

Appellant cites several cases from the Criminal Court of Appeals of Texas. In disposing of the Texas cases, we quote with approval from the State v. Tappe, 53 S.D. 22, 219 N.W. 882, 883, where the South Dakota Court said:

"As supporting his contention that Ed Tappe's testimony was not available while he was jointly charged, ap-

pellant's counsel cites numerous Texas decisions, but these cases do not apply in this state. The Texas decisions are governed by a statute, but we have no similar statute."

There are several reasons why we must affirm the trial court in refusing to grant appellant a new trial on the affidavit of Arch Ferrell.

Undoubtedly, appellant and his counsel were thoroughly familiar with the evidence of Arch Ferrell, now claimed to have been unavailable to Fuller on his trial. At the time Fuller was tried, Ferrell was present in Jefferson County and subject to a subpoena as a witness for appellant. The mere statement of his attorney to the effect that he would not have let Ferrell testify for appellant if summonsed for that purpose is without merit. With all due deference to Ferrell's attorney, it was not for him to say that he would not let Ferrell testify. We do not mean to say that he could not have claimed the privilege for his client against self-incrimination, but he could not do so in this manner. Moreover, we have examined with care the affidavit of Ferrell and it contains, so far as we can say, nothing of a self-incriminatory nature whatever. In short, it is a mere denial that he saw the appellant on the night of the homicide before Albert Patterson was killed. The facts stated in his affidavit are simply contradictory and a denial of facts stated by the witnesses for the prosecution. It is merely cumulative to this extent. Appellant's witnesses, if believed, proved a perfect alibi for the appellant. We cannot say that one more witness, the witness Ferrell, whose testimony would merely contradict the state witnesses, would have changed the result of appellant's trial.

■ We have often said that the granting of motion for a new trial on newly discovered evidence, and we interpolate the evidence claimed to be unavailable, rests in the sound discretion of the trial court. That principle is particularly applicable in this case. The learned trial court that pre-

sided at the trial of appellant, Fuller, also presided at the trial of Arch Ferrell for the same offense. The trial court was particularly positioned to determine the question of whether or not the alleged unavailable evidence would have probably changed the result of appellant's trial. He found that it would not. He was in a better position to determine this question than we are, and we will not reverse his finding on this question. Maund v. State, 254 Ala. 452, 48 So.2d 553.

Appellant's Proposition of Law No. III

■ "The Court erred in denying appellant a new trial after conclusive proof was offered that rights secured to him under Title 62, Sections 209–213, inclusive, Code of 1940, had been violated."

The statutes set forth in Title 62, Sections 209–213, inclusive, of the Alabama Code of 1940, constitute part of what is commonly referred to as the "Jefferson County Secret Venire" law. The cited sections read as follows:

"§ 209. Unlawful to disclose. It shall be unlawful for any judge of the circuit court, the clerk of the court, the sheriff, or any chief ,clerk, clerk, deputy clerk, assistant clerk, stenographer, deputy sheriff, *or any other person employed under, or working under the supervision, authority, or direction of either of said officials to disclose,* directly or indirectly, to any person the name or identity of any person who has been drawn or summoned for service as a juror in any such court, and the fact of his having been drawn or summoned for such jury service, at any time prior to the calling of said juror's name in open court, pursuant to the provisions of this code, except as is necessary in performance of the duties imposed by law upon said persons in the drawing and summoning of jurors." (Emphasis added.)

"§ 210. Unlawful to furnish venire, etc. It shall be unlawful for any judge

of the circuit court, the clerk of such court, the sheriff, or for any chief clerk, clerk, deputy clerk, assistant clerk, stenographer, deputy sheriff, *or any other person employed under, or working under the supervision, authority or direction of either of said officials to furnish* to any person, or to exhibit to any person, the original or a copy of any venire of jurors drawn or summoned for jury service in such court at any time before the names of the jurors have been called in open court pursuant to the provisions of this code except as is necessary in the performance of the duties imposed by law upon said persons in the drawing and summoning of jurors." (Emphasis added.)

"§ 211. Clerk and sheriff keep record secret. It shall be the duty of the clerk of the circuit court, and of the sheriff, to keep all venires and copies thereof, cards or slips containing the names of jurors drawn, summons, returns, docket entries, and all other papers, records, documents, and writings pertaining to the names or identity of persons drawn or summoned for jury service in any such courts, in a place of safe-keeping under lock and key, prior to the time that the names of the jurors are called in open court pursuant to the provisions of this code save at such times as the due performance of their respective duties as imposed by law in issuing venires and summoning jurors, and making return of service, makes it reasonably necessary that said papers, records, documents or writings be withdrawn from the place of safekeeping."

"§ 212. Records not public until juror in court. All cards, venires, summons, returns, and all other papers, records, documents and writings pertaining to the drawing or summoning of jurors, or to the names or identity of jurors drawn or summoned in the courts shall not be public records until the names of the jurors have been

called in open court, pursuant to the provisions of this code."

"§ 213. Chapter applies to all cases. This subdivision shall apply to all types of cases in the courts, whether civil or criminal, capital or otherwise; and the defendant in a capital case shall not be entitled to, nor served with a list of the names of the jurors drawn for the week in which his trial is set."

We quote from appellant's brief as follows:

"At a hearing on the motion for a new trial, the Clerk of the Circuit Court of Jefferson County, Alabama, testified that he had been employed in the Clerk's office and as Clerk for a period of time starting in 1928; that on the day that the venire was drawn in the instant case, it was drawn in the manner prescribed by law and that no party saw the names of the jurors other than he and the Presiding Judge; that he took the cards containing the names of the prospective jurors to his office and that he then went to the office of the State Examiner of Public Accounts which was located on another floor of the Jefferson County Courthouse; that he contacted the Secretary in the State Examiner's office, whose name was Eloise Strozier; that Mrs. Strozier prepared the list of jurors for him and that the cards setting forth the names of the jurors were in Mrs. Strozier's office for a period of several hours; that Mrs. Strozier was not an employee of his; that he had seventeen employees in his office; and that insofar as he knew, this was the first occasion on which a list of the venire had ever been prepared outside of the office of the Clerk of the Circuit Court.

"On the same occasion, Mrs. Eloise Strozier testified that she was not employed in the Clerk's office; that she was employed by the State of Alabama; that on the night prior to the

date on which she had prepared the jury list, that she had been contacted by her superior, Mr. Frazier, at her home and that Mr. Frazier instructed her to assist the Clerk of the Circuit Court."

The clerk further testified, in effect, that when he received the cards it became necessary to type the jury venire, and that he had no one immediately available to type the cards because of the congested condition in his office and the absence of his chief clerk on account of illness, who generally prepared the jury venire; that he asked Mr. Frazier if he could use his secretary to type the cards, and Mr. Frazier agreed for his secretary to type them, and the secretary agreed to type them at his direction; and that Mrs. Strozier's office is completely private; that Mrs. Strozier prepared the list under his supervision and direction as Circuit Clerk of the Tenth Judicial Circuit, and he was in and out of her office until the job was completed, and that she was warned of her duties and penalties involved.

Mrs. Strozier testified, in effect, that during the time she was typing the list no one other than Mr. Swift, the Clerk, came into the office, and that no one saw the list, and that she did not divulge the name of any individual who appeared on the list to anyone, and that after she finished the work she returned it to Mr. Swift who was in her office when she completed it.

In Jenkins v. State, 245 Ala. 159, 16 So.2d 314, this Court said:

"The appellant, Ben Jenkins, was indicted by a grand jury organized in the Jefferson County Circuit Court, for a capital felony. He was duly tried and convicted of this offense by a jury drawn, summoned and organized as provided by Subdivision 5, Tit. 62, of the Code of 1940, which embraces Section 196 to Section 228, inclusive— a codification of the law enacted and operating in Jefferson County prior to the adoption of the code—the dominant purpose of which, as appears from its provisions, was to provide secret venires for use in the courts of that county for the trial of all cases 'whether civil or criminal, capital or otherwise,' Code 1940, Tit. 62, § 213, as a safeguard against the supposed pernicious evil of tampering with or fixing jurors for the trial of cases, before the juries are organized and come under the immediate protection of the court. This jury law has been upheld as constitutional by this court. Morris v. State, 234 Ala. 520, 175 So. 283; Vaughn v. State, 236 Ala. 442, 183 So. 428; Dyer v. State, 241 Ala. 679, 4 So.2d 311."

We find no cases in this state directly in point on the question involved. In the analogous case of Williams v. State, 96 Tex.Cr.R. 144, 256 S.W. 601, 602, that court said:

"Nor do we think there is merit in the contention that a son of a deputy tax collector of said county aided in the transcription of names from the cards drawn from the jury wheel to the special venire list. The father, a deputy tax collector, was present, and testified that he personally supervised the work of his son in writing the names on the jury list after the cards were drawn from the wheel, and that he knew it was correctly done. The son drew no cards from the wheel and placed none in same. Article 5154 of our Revised Civil Statutes contains a provision that no other person than those named shall be permitted to be present when the cards are drawn from the jury wheel, but there seems no provision that a violation of this inhibition should result in quashing of the venire or panel. Section 14 of the original jury wheel law (see Chap. 139, Acts Regular Session, 1907) does provide that if any person violates any of the provisions of the act he might be punished, but

we do not conclude that this necessitates the quashing of the venire or the jury panel. The irregularity of permitting the presence of one not named in the statute might, under some circumstances, be sufficient to justify the quashing of the jury panel or venire, but if the state meets the burden seemingly imposed upon it by proof of such irregularity, by showing that nothing was done or occurred from which any injury could result, we would not think it proper to so quash said venire."

In the first place, we do not think the statutes quoted above have been violated. It will be noted that the above-quoted statutes do not provide a method for making a list of the venire once it is drawn, and we must look to Sec. 39 of Title 30, Code of Alabama 1940, which provides:

"Clerk issues venires.—The clerk shall issue venires for the jurors so drawn and they shall be summoned for their respective weeks, and sworn and empaneled in the same manner as petit juries for the first week of the session."

It is, therefore, the duty of the clerk to prepare the venires. The italicized portions of Sections 209 and 210, supra, clearly indicate that so long as the person actually typing the venire is working under the supervision, authority or direction of the clerk, the statutes have been complied with.

If circumstances make it impossible to perform his duty in this regard, because of the lack of help or because of sickness or otherwise, he is not impotent to secure the services of someone else to perform the services under his supervision. That is exactly what he did in this case because of the necessity.

In the second place, the undisputed evidence taken on the motion for a new trial was to the effect that defendant had suffered no injury whatever by the action of the clerk in securing the services of Mrs.

Strozier for the purpose of copying the names of the veniremen. Rule 45, Code 1940, Tit. 7 Appendix.

Therefore, appellant's Proposition of Law No. III is without merit under the circumstances of this particular case.

Appellant's Proposition of Law No. IV

■ "A statement made by Special Assistant Attorney General, Cecil Deason, in his closing argument was so inflammatory and prejudicial that its injurious effect was ineradicable."

In his closing arguments to the jury, Mr. Deason made the following remarks:

"By your verdict, you are going to say to the people of Alabama that Albert Fuller is guilty of murder in the first degree and you are going to say that there is not a jury in the State of Alabama that is going to permit or stand by and give a license to the people and the gamblers and the prostitutes of Russell County to come back. If you turn this man lose, you are going to give him a license to go back down there and engage in the businesses that he has been engaged in according to the evidence in this case and I don't think that you are going to permit it."

Upon timely objection by the appellant, the trial court sustained the objection and of its own motion stated to the jury as follows:

"The Court sustains the objection to the statement that a verdict acquittal will amount to a license to the defendant to return to Phenix City and engage in illegal activities, or words to that effect, and you are instructed, gentlemen, not to consider such argument or to permit it to have any effect upon you in your deliberations. The matter for you to determine, as the Court will tell you later is whether or not—not to decide the future of what the defendant might do in the

future, but you are to decide whether he has been guilty in the past of the offenses charged against him."

We are thoroughly familiar, as is the Bench and Bar, with that line of decisions of this Court with respect to erroneous statements made by counsel in argument which are so inflammatory and prejudicial that the injurious effect is ineradicable.

Pretermitting the question as to whether or not the statement made by the Special Assistant Attorney General was beyond the bounds of forensic efforts, and, therefore, erroneous, we are clear to the conclusion, after a careful consideration of the statements made by the Special Assistant Attorney General, that they were not ineradicable, and that the charge of the trial court to the jury not to consider them was amply sufficient for that purpose and that no injury occurred to the appellant in this regard. See Burkett v. State, 215 Ala. 453, 111 So. 34; Burch v. State, 32 Ala.App. 529, 29 So.2d 422; Elliott v. State, 19 Ala.App. 263, 97 So. 115; Bell v. State, 25 Ala.App. 441, 148 So. 751, certiorari denied 227 Ala. 44, 148 So. 752; Allen v. State, 33 Ala.App. 70, 30 So.2d 479; Anderson v. State, 209 Ala. 36, 95 So. 171; Washington v. State, 259 Ala. 104, 65 So.2d 704; Birmingham Ry., Light & Power Co. v. Gonzalez, 183 Ala. 273, 61 So. 80.

Appellant's Proposition of Law No. V

 "The verdict of the jury was contrary to the preponderance or great weight of the evidence."

We have carefully examined the entire record and find that the evidence for the state was ample to support the verdict of the jury, whereas that for the defendant strongly negatived the fact of his guilt. The issue was thus plainly for the determination of the jury and this Court cannot sit as one of original trial and thereby supplant its findings. A multitude of cases could be cited in support of the proposition that where there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense. Ball v. State, 252 Ala. 686, 42 So.2d 626, certiorari denied 339 U.S. 929, 70 S.Ct. 625, 94 L.Ed. 1350; Adams v. State, 29 Ala.App. 547, 198 So. 451; Davis v. State, 229 Ala. 674, 159 So. 209; Glover v. State, 25 Ala.App. 423, 148 So. 160, certiorari denied 226 Ala. 578, 148 So. 161; Freeman v. State, 21 Ala.App. 629, 111 So. 188; Skinner v. State, 22 Ala.App. 457, 116 So. 806; McKenzie v. State, 25 Ala.App. 586, 151 So. 619; 7 Ala.Dig., Criminal Law, ⊝935, ⊝1159 (2, 3, 4), ⊝1160; 11 Ala.Dig., Homicide, ⊝332(2); Brown v. State, 30 Ala.App. 5, 200 So. 637, certiorari denied 240 Ala. 648, 200 So. 640; Huston v. State, 237 Ala. 222, 186 So. 182; Smith v. State, 23 Ala.App. 488, 128 So. 358, certiorari denied 221 Ala. 217, 128 So. 359.

 It is true that the evidence for the defendant, if believed by the jury, proved that this appellant could not have committed the offense for which he is charged. On the other hand, the jury had a right to believe the evidence introduced by the state. True, evidence was offered which tended to impeach some of the state witnesses, and on the other hand, evidence was offered tending to impeach some of defendant's witnesses. The jury and the trial court, in overruling appellant's motion for a new trial based on appellant's Proposition 5, were better positioned than we to determine that question. The trial court's action in overruling the motion for a new trial based on this ground carries great weight in this Court, and he will not be reversed unless his ruling was plainly and palpably wrong. We are not convinced that his ruling in this regard is so unjust as to work a reversal. Cobb v. Malone, 92 Ala. 630, 9 So. 738; Dollar v. McKinney, 267 Ala. 627, 103 So.2d 785; Mintz v. Millican, 266 Ala. 479, 97 So.2d 769;

**334**

State v. Carter, 267 Ala. 347, 101 So.2d 550.

Appellant's Proposition of Law No. VI

■ "Evidence of statements made by deceased which are relied on to establish a motive for defendant to commit the crime with which he is charged is inadmissible in the absence of a showing that defendant had knowledge of the statements."

We quote further from appellant's brief:

"The trial court admitted testimony that during his campaign for the office of Attorney General, Mr. Patterson had made statements that he would stamp out crime in Phenix City and the entire state. The solicitor stated that this testimony was for the purpose of showing that the defendant had a motive to commit the crime with which he was charged. There was no evidence that the defendant had any knowledge of the statements: therefore, we contend the trial court committed error in permitting such testimony to be introduced.

"There can be no doubt that facts which are unknown to a person cannot influence his actions in any way. The law recognizes this, and requires that facts which are relied on to show a motive must be shown to have been known to the defendant.

"As a general rule, statements and declarations made by the deceased are not competent evidence against the defendant unless made in the defendant's presence, or unless they are admissible as part of the res gestae or as dying declarations. Statements by the deceased which could provide a motive for the crime with which the defendant is charged may be admissible if they have been communicated or made known to the defendant."

On the other hand, the state contends that in order to show that defendant had a motive for killing Albert Patterson was

the fact that the appellant, Albert Fuller, who was then the Chief Deputy Sheriff of Russell County, Alabama, was directly connected with the receiving of graft from gambling operations in Phenix City and Russell County, Alabama, and was also connected with other vice conditions wherein appellant received bribes. The state introduced evidence tending to prove that appellant had admitted the acceptance of bribes from the operators of illegal operations in Phenix City, and Russell County, Alabama.

The trial court allowed the state to introduce testimony showing a wide distribution of campaign statements made by Albert Patterson in his race for Attorney General. These statements consisted of public verbal statements made throughout the state, public billboard advertisements, public newspaper advertisements, public speeches over the radio and television and at public gatherings. The trial court allowed no private statements of Albert Patterson to be shown, but confined the state to the showing of statements of the deceased that were made repeatedly and were made publicly throughout the State of Alabama, including Phenix City and Russell County, Alabama, in the manner above indicated.

The crux of appellant's argument is that the state failed to show that the defendant had knowledge of these matters.

The state further contends that this alleged error is unavailing to the appellant for two reasons: First, that the defendant did have actual knowledge of the statements made by Albert Patterson, and second, that he interposed no objections to this line of testimony on the specific grounds that the defendant did not have knowledge of the statements, and asserts the same for the first time on appeal.

In the testimony of the defendant himself, it appears that he had known the deceased for some 10 or 15 years; that he was a Chief Deputy Sheriff of Russell County, Alabama, in which the City of Phenix City is located. Appellant stated that the deceased was a personal friend.

He testified that he supported Albert Patterson in his campaign for Attorney General and that he was teased about it around the courthouse in Phenix City. Appellant stated that he solicited votes for Albert Patterson, even though his employer, the sheriff, supported Patterson's opponent. He testified that he went so far as to talk with John Patterson, the son of the deceased, on the day of the killing as to whether or not Albert Patterson was going to appoint Fuller as an investigator. He further testified that both Arch Ferrell, the Circuit Solicitor of Russell County, and Ralph Matthews, the Sheriff of Russell County, had criticized him for supporting Albert Patterson. His own testimony shows as a fact that he was directly interested in the campaign of Albert Patterson to the extent that he was soliciting votes, to the extent that he expected, or had solicited, a job, to the extent that he had been criticized by his employer, and that he was interested in the Attorney General's race. These facts, shown by the testimony in the record, together with the further testimony as to the wide publicity given to Albert Patterson's public campaign statements throughout the State of Alabama and in Phenix City, Alabama, where both the deceased and appellant resided and had resided for many years, and the public notoriety attending these statements throughout the state, and particularly in Phenix City, make the conclusion inescapable that the appellant had full knowledge of the contents of Patterson's campaign pledges. The jury could well infer that the appellant was fully apprised of these statements and publications at the time of the killing. It is also significant that the appellant in his testimony did not deny that he had knowledge of the contents of the public statements.

It would tax judicial credulity to find from this record that the appellant was not fully aware of the campaign waged by the deceased for the office of Attorney General of the State of Alabama.

As to the state's second insistence that appellant opposed no objection to this line of testimony on the specific grounds that the defendant did not have knowledge of the statements and other matters set out above, we have examined the record and find that the appellant did not specifically object to the statements and the other evidence on the specific grounds that defendant did not have knowledge of it. The record discloses the following:

"Mr. Beddow: But do you want us to assign grounds of objection?

"The Court: I think that that would be perhaps advisable at the present stage. It may be at a later stage grounds can be obviated until I can understand more the theories of the parties. You may let the jury come in.

"The Court does consider the statement made by defendant as a statement of grounds of objection."

Thereafter, counsel for defendant assigned specific and additional grounds not including the grounds now urged on appeal.

In Adkins v. State, 20 Ala.App. 278, 101 So. 779, 780, the court refused to consider an objection under Circuit Court Rule 33, which reads as follows:

"When in the progress of the trial of any cause in a court of original jurisdiction, objection and exception are reserved to introduction of testimony that is not patently illegal, or irrelevant, such exception will not be considered an error, unless the record shows that the grounds of objection were specified. In all cases, the presiding judge, before ruling on any objections to testimony, may call on counsel to specify the grounds on which it is rested; and the appellate court in revising such decision, must consider only the grounds of objection which are shown to have been clearly specified."

Circuit Court Rule 33, Title 7 Appendix, Code of Alabama 1940, was in force and effect at the time this case was tried.

In the case of Smith v. Bachus, 195 Ala. 8, 70 So. 261, 264, this Court stated:

"Plaintiffs offered in evidence a deed from D. C. and R. A. Harris, of date April 10, 1894, to Martha Ann Harris, to the land sued for in the first count, to the introduction of which deed the defendant objected, assigning as specific grounds that it was 'incompetent evidence,' that 'it was not shown that D. C. and R. A. Harris were in the possession of the lands conveyed,' and that the instrument was 'indefinite as to the title' conveyed. When specific objection is made, all other objections are waived. Rule 33, Circuit Court (page 1527 of the Code of 1907); B[irmingham] R., L. & P. Co. v. Saxon, 179 Ala. 136, 59 So. 584; So[uthern] Ry. Co. v. Gullatt, 158 Ala. 502, 48 So. 472."

To like effect are the following cases: Adkins v. State, supra; Harbin v. State, 15 Ala.App. 57, 72 So. 594; Alabama G. S. R. Co. v. Bailey, 112 Ala. 167, 20 So. 313; Jackson v. State, 35 Ala.App. 542, 50 So.2d 282; Holcombe v. State, 17 Ala.App. 91, 82 So. 630; People v. Auerbach, 176 Mich. 23, 141 N.W. 869; Bettman v. United States, 6 Cir., 224 F. 819, 140 C.C.A. 265; Bentel v. United States, 2 Cir., 13 F.2d 327, certiorari denied Amos v. United States, 273 U.S. 713, 47 S.Ct. 109, 71 L.Ed. 854; People v. Dunbar Contracting Co., 215 N.Y. 416, 109 N.E. 554, affirming 165 App.Div. 59, 151 N.Y.S. 164; United States v. Hall, D.C., 206 F. 484; Thomas v. State, 11 Ala.App. 85, 65 So. 863.

In the instant case, the trial court properly admitted the evidence adverted to above.

### Appellant's Proposition of Law No. VII

"It was error for the court to admit evidence of Willie B. Painter of an alleged conversation with appellant as to his acceptance of a bribe."

As a broad general rule in criminal prosecutions, evidence as to the guilt of the accused of other and distinct offenses unconnected with the one charged is not admissible as substantive evidence to prove the guilt of the offense charged. But as was said in the case of Hodge v. State, 199 Ala. 318, 74 So. 373, 374:

"The general rule as to inadmissibility of evidence of other crimes is well recognized, but to this rule there are many exceptions. That the evidence in this regard was admissible in connection with all other evidence in the case, together with defendant's threats against the officers as tending to show motive, is clear from the following authorities: Underhill Cr.Ev. (2d Ed.) §§ 87, 88, 321–323; Spicer v. State, 188 Ala. 9, 65 So. 972; Hawes v. State, 88 Ala. 37, 7 So. 302; Allison v. State, 1 Ala.App. 206, 55 So. 453; note to People v. Molineux, [168 N.Y. 264, 61 N.E. 286] 62 L.R.A. 193 * * *."

In the case of Harden v. State, 211 Ala. 656, 101 So. 442, 444, it was said:

"Motive and intent are involved in homicide cases. These are not the same in law. 'Intent' is the ripened purpose to effect a result; while 'motive' is the moving power which leads the mind to desire the result and form the purpose. The intent must exist in all cases. If a crime is clearly shown to have been committed by the accused, as in case of one intentionally and without cause striking a deadly blow with an axe, the question of motive would be of little importance. But where the direct evidence is in conflict as to whether the accused did the act, or is partially or wholly circumstantial upon that issue, the question of motive becomes a leading inquiry.

"In such case if there is any evidence tending to support a reasonable inference that the homicide was committed to conceal another crime, evidence of such other crime is admissible.

"Wide latitude is given in search of a real motive to connect the accused

with the killing. However inconclusive may be the evidence standing alone, if it explains other circumstances tending to show guilt, it should go to the jury as a circumstance to be weighed with that caution which should always obtain in passing upon circumstantial evidence. Walker v. State, 85 Ala. 7, 4 So. 686, 7 Am.St.Rep. 17; Johnson v. State, 17 Ala. 618; Gassenheimer v. State, 52 Ala. 313; Nail v. State, 12 Ala.App. 64, 67 So. 752; Hawes v. State, 88 Ala. 37, 7 So. 302; Underhill on Crim.Ev. § 154; note 105 Am.St. Rep. 987; note 62 L.R.A. 211; 30 C.J. p. 193, § 423."

See, also, Aplin v. State, 19 Ala.App. 604, 99 So. 734.

The evidence for the state tended to show that during his campaign for Attorney General, Albert Patterson had made statements and had distributed literature over the State of Alabama and in Phenix City, Russell County, Alabama, pledging to eradicate gambling and other vices in the state, and particularly in Russell County and Phenix City, Alabama.

██ The evidence of Willie B. Painter was to the effect that defendant had made statements to a state investigator after Patterson had been killed that he had received money from slot machine operations in Russell County and had received or accepted bribes in connection with the operation of houses of prostitution.

██ Clearly, motive for the killing of Patterson to prevent him from carrying out campaign pledges is a proper inquiry in this case, and the commission of other crimes is admissible where it shows or tends to prove a motive for the homicide. There was no error in this regard.

Appellant's Proposition of Law No. VIII

[23] "It is the inalienable right of an individual charged with crime to prove any fact touching the credibility of a witness testifying against him."

During the course of the cross-examination of state' witness, James Radius Taylor, the following question was propounded to the witness:

"Q. I will ask you if on an occasion when certain news items were being carried in the Columbus paper with regard to the slaying or with regard to the disappearance of a Mrs. Roach who had been residing in Lafayette, Alabama, if you didn't go to the Sheriff of Muscogee County in Columbus, Georgia, and if you didn't go to the Sheriff, Ernest Howell,. and if you didn't tell Ernest Howell that you had seen a woman riding in an automobile with two soldiers prior to the date that the search was begun for her and if the sheriff didn't get you to describe the woman and if you didn't then get in the automobile with the sheriff and take them to Cusseta, Georgia, and to many points pointing out different spots and places at distant points where you claimed you saw this woman in the company of two soldiers?"

Thereupon, the following occurred:

"Mr. Deason: We object to that, if the Court please.

"The Court: I am not able to see— does it have some relationship to this case, the thing you are asking him about?

"Mr. Beddow: I am asking him this question, if Your Honor please, to follow it later with a pattern of conduct on the part of this man in his confidence in himself to solve certain homicides and we expect to offer proof in regard to not only his conduct but the manner and way in which his connection with the investigation of the murder of Mrs. Roach terminated.

"Mr. Deason: We object to that, if the Court please, couldn't be material in this case.

"Mr. Beddow: Yes, sir, it shows his pattern of conduct. (Whereupon the jury retired from the courtroom.)

"The Court: Mr. Beddow, I would like for you to indicate more fully and state to the Court what you mean by pattern of conduct and specifically what conduct on his part you expect to show.

"Mr. Beddow: We expect to show, may it please the Court, he went to Sheriff Ernest Howell, he told Mr. Howell that he had seen items of news with regard to this lady, Mrs. Roach, that he had seen her moving around in the confines of Columbus, Georgia, he had seen them at distant points with the soldiers and this lady at distant points with each other, that this man in his pretense that he knew something about the two soldiers and knew something about the lady in question had the sheriff accompany him to first place and then another pointing out where he had seen them together, describing the automobile, describing the two soldiers; that he on one of the occasions when he was accompanying the Sheriff of Muscogee County—had accompanied the sheriff to Cusetta, Georgia; that after much investigation the body of this—I mean prior to determination, the evidence will show, of this man's connection with it, the sheriff in his investigation of this murder, the Sheriff of Chambers County, J. B. Abney, and the Sheriff of Muscogee County, Ernest Howell, they found this woman's body in a ravine 15 miles south of Columbus, Georgia, just beyond Fort Benning.

"We expect the testimony to show the sheriff carried Mr. Taylor to Columbus and he went into great detail, that the sheriff became rather harsh in his examination of the witness, Mr. Taylor, who is now the witness, and in the presence of another taxi-cab driver who had a deputy sheriff commission, Mr. C. A. Trammell, he finally admitted the whole thing was a hoax and he hadn't seen this woman and wouldn't know her if he saw her.

"We think that is admissible for the reason that it develops a certain pattern of conduct with regard to this man that might be calculated to show that he is either the biggest prevaricator in the world or that he has delusions and hallucinations and likes to be identified with investigations of this kind."

After the jury returned to the courtroom, the state renewed its objection to the evidence and the court sustained it.

The appellant in brief cites the following cases: State v. Poston, 199 Iowa 1073, 203 N.W. 257; State v. Brooks, 181 Iowa 874, 165 N.W. 194; People v. Evans, 72 Mich. 367, 40 N.W. 473; Rice v. State, 195 Wis. 181, 217 N.W. 697; Dawes v. State, 34 Okl. Cr. 225, 246 P. 482; People v. Wilson, 170 Mich. 669, 137 N.W. 92, 41 L.R.A.,N.S., 216.

We have examined those cases and are in accord with the general holding in so far as it pertains to rape and seduction cases where the prosecuting witness testifying is impeached by showing that she had made similar false charges against other men. Such testimony would tend to create some doubt in the minds of the jury where the very issue in the case on trial is her rape or seduction. The question as to the extent of cross-examination lies within the wide discretion of the trial court.

It was stated in the case of State v. Hougensen, 91 Utah 351, 64 P.2d 229, 238:

"If the cross-examiner claims that he desires to show the witness as one of low morality or a dissolute person by a series of questions showing such facts, conduct or associations with disreputable characters as would tend to so stamp the witness as not worthy of credit, the court should in the absence of the jury take the offer of such questions, and determine if it would so tend to show such character that the jury should have it as part of the case in order to judge of the credibility of the witness and, if so, permit in the presence of the jury such questions to be asked * * *."

It seems that the trial court in this case followed the same procedure as outlined in the Utah case, and after hearing the purpose of the offer by the appellant, the learned trial court determined that the purported evidence attempted to be elicited from this witness in no way would have tended to show such a pattern of conduct on the part of the witness and was inadmissible for any purpose. We cannot say that he abused his discretion.

We find no reversible error in the record and the case is therefore affirmed.

All the Justices concur.