HARRIS, Presiding Judge.
Appellant was convicted of murder in the second degree and the jury fixed his punishment at twenty years imprisonment in the penitentiary. He was represented by retained counsel and at arraignment pleaded not guilty and not guilty by reason of insanity. After sentence was imposed he gave notice of appeal and petitioned the Court for a free transcript. He was found to be indigent and he was furnished a free transcript. New counsel was appointed to represent appellant on this appeal.
Omitting the formal parts the indictment reads as follows:
“The Grand Jury of said County charge that, before the finding of this indictment,
ROBERT WINSTON LAMBERT, alias
BOB BAMBERT, alias
ROBERT W. LAMBERT, alias
WINSTON LAMBERT, alias
ROBERT LAMBERT,
whose name is to the Grand Jury otherwise unknown, unlawfully, and with malice aforethought, killed Alma Jean Weaver, otherwise known as Alma Jean Lambert, by hitting her with his hands, or by hitting her with his fists, or by hitting her with a baseball bat, against the peace and dignity of the State of Alabama.”
At the close of the State’s case appellant made a motion to exclude the evidence only as to murder in the first degree alleging the State failed to prove the element of premeditation. This motion was overruled. We will summarize the evidence.
James Larry Gothard testified that the deceased, Alma Jean Lambert, was his mother. He said that she was married to Winston Weaver but they were never divorced. She had lived with appellant approximately four years; that during this period of time Gothard lived with his mother and appellant for about two weeks but moved out because “there was too much fighting and fussing going on to get to sleep at night.” He further stated that appellant kept a baseball bat beside his bed or somewhere handy. He admitted that his mother and appellant often drank to excess and both would get drunk.
Joseph Lambert testified that appellant was his brother and that on Monday, November 15, 1976 he arrived at appellant’s trailer around six o’clock that morning; that a few minutes later appellant left to go to his place of employment. He said that he and Alma Jean Lambert started drinking gin and beer and drank together until eight or nine o’clock that night. He stated the reason he went to the trailer that morning was to tell his brother that he was moving back to his rented room on East Second Street in Oak Park.
He further testified that when it got dark he told Alma Jean that he was going *775 home and she asked him to take her to her son’s home on Cherry Street. He drove her to Cherry Street but she didn’t know the number of her son’s home. He then drove to East Second Street and went to his room. Alma Jean spent the night in the bedroom with his landlady. On Tuesday night appellant came to the house on Second Street and shouted to Joseph Lambert through the window. He told appellant he did not want any trouble with him and appellant left but returned shortly and entered the house. He and appellant “tangled” and appellant kept saying he knew Alma Jean was in the house. He said the second time appellant came to the house he had a baseball bat in his hand. He told appellant that he had called the police twice and he had better leave. Appellant and Alma Jean left together and this was the last time he saw Alma Jean. He stated that appellant was drinking but he was not drunk.
William L. Gardener testified that he was employed by the Montgomery Fire Department as a medic; that around 5:00 a. m. on November 18, 1976 he and his partner answered a call at the home of appellant. He stated that appellant let them in the trailer and showed them the body of Alma Jean Lambert lying half on and half off the bed. He stated that he examined the body and that rigor mortis had set in and that she was cold and stiff. He said appellant was highly nervous and appeared to have been drinking.
James R. Brown, Jr., employed by the Montgomery Fire Department Rescue Unit, testified that he had occasion to go to the trailer home of appellant on November 18, 1976 where he found the deceased in the bedroom. He asked appellant if his wife had been sick and he replied, “No, I beat her.” Appellant then explained that he found his brother with his wife and he beat him up and then beat his wife and drug her in the house. Brown stated he could not tell whether appellant had been drinking but appellant told him that he had been drinking.
Police Officer B. W. Knighten testified that he and his partner went to appellant’s trailer home on November 18, 1976, and in the back bedroom they found a white female lying on the bed apparently dead. He believed this was a homicide and called the Homicide Unit.
Clifford 0. Bolden, an evidence technician with the Montgomery Police Department, stated that on November 18, 1976, he arrived at the scene of the alleged homicide and made numerous photographs of the homicide scene and collected physical evidence from Officer Tom Totty. He photographed the bedroom where the victim was found and adjoining rooms where there were clothes and a softball bat. He identified State’s Exhibit 2 as an accurate portrayal of the bathroom where the bat was located. This Exhibit was introduced into evidence without objection. This witness also identified State’s Exhibit 4 as the baseball bat found at the scene and Exhibits 5-7 as items of clothing found at the scene. All of these items were given to Officer Totty who personally delivered them to the Toxicologist.
Police Officer Totty testified that he received State’s Exhibits 4-7 from Detective Bolden and kept them in his exclusive possession until he delivered them to the Toxicologist the following day. Totty also identified State’s Exhibit 9 as a piece of evidence collected from appellant’s automobile. He observed blood on the passenger side of the dashboard, the front seat backrest and on the front seat between the driver’s side and the passenger side. He obtained samples of this blood and delivered them to the Toxicologist. State’s Exhibit 8, another blood sample, was admitted into evidence without objection.
Dr. Richard Roper, the Toxicologist in charge of the Montgomery Laboratory, whose qualifications were admitted by defense counsel, performed a postmortem examination on the body of the victim on November 18, 1976. He made numerous photographs of the nude body of Alma Jean Lambert which revealed cuts, bruises and lacerations over her entire body. Over appellant’s objection he was permitted to illustrate his autopsy findings with the use of *776 these photographs and slides on a screen to the jury.
Dr. Roper stated that based on his autopsy examination and findings it was his opinion that death occurred as the result of a traumatic intracranial hemorrhage though the skull was not fractured. He said the hemorrhage was the result of some violent force applied to the body and to the head area, causing the hemorrhage to be of a slow nature. He further testified that this would have resulted from being beaten about the face.
Ms. Mary Wisdom, a Toxicologist, whose qualifications were admitted, testified that the blood samples submitted to her revealed that Alma Jean Lambert’s blood type was Group 0. She stated that her examinations of State’s Exhibits 10-12, stained gauze, which she received from Officer Totty, were inconclusive, but that State’s Exhibit 13, stained tissue paper, revealed that the stain was Group 0 human blood.
Ms. Wisdom identified State’s Exhibit 5, a ladies coat which had a large area of leaf material on the back as well as Group 0 human blood stains on it. She also identified State’s Exhibit 9, a raincoat, on which she found Group 0 human blood. She examined State’s Exhibit 4, the softball bat and found Group 0 human blood on it. State’s Exhibits 4, 5, 7, 9 and 13 were admitted into evidence without objection.
Detective Richard F. Matthews of the Homicide Unit was assigned to investigate the death of Alma Jean Lambert. He went to appellant’s trailer home where he viewed the body of the deceased. Appellant was arrested and carried to Headquarters where Detective Humphrey read appellant the Miranda rights and warnings in the presence of Detective Matthews and appellant signed a waiver of rights form which was witnessed by Matthews.
A voir dire hearing was conducted out of the presence and hearing of the jury and it developed that the officers made no threats, promises, rewards or other inducements to appellant to sign the waiver of rights form. It was further determined that the officers made no threats, promises, rewards or other inducements to appellant to get him to make a statement concerning the death of his wife. The Court determined that everything appellant told the officers was voluntary and of his own free will.
Back before the jury the proper predicate was laid and the waiver of rights form, State’s Exhibit 23, and appellant’s confesso-ry statement, State’s Exhibit 24, were admitted into evidence and read to the jury.
The confessory statement is as follows: “The first question Detective Humphrey asked was: Mr. Lambert, would you tell me about the incident in which your common-law wife, Alma Jean, was beat? And the answer: Yes, sir, I will. The question again: What happened? The answer was: I worked Monday and I came home from work and when I came home from work she was gone with my brother, gone, and my brother was gone also. I did not find her Monday night, and I did not go and look for her. I started drinkin’, and when I went over to my sister-in-law’s house in Oak Park on East Second Street, and we all drank, I then asked Katherine Lambert where, or had she seen my wife Alma. They would not tell me right then, but we kept drin-kin’ and she did tell me that she was in the house, and I went into the back of the house and found her, and she had been drinkin’ also. I dragged her out of the house, and I then got into an argument with my brother, Joe Lambert, and he got up out of bed and came in where I was, and I hit him, and told him he should have left Alma at home, and not take her off drinkin’. I then went to my car and got the ball bat out, and my brother came outside where I was, but he never did come up to me. I told him he should have not done me this way. And he was, as he was stayin’ with me, and they should have stayed at home while I was workin’. I was hit on, I was hit on the head by my brother with his fist or something. I do not really know what. I then took Alma home to Fleming Court, where we sat in the car and we were talking, and one word led to another, and *777 then I started beating her. I then got out of the car and I beat her with my fists and I think I kicked her some, but I really did not know for sure. She was laying on the ground, and I sat down in the car for a while, then I drug her into the house and put her in the bathroom. She laid in the bathroom a long time, and I was drinkin’, and then I put her in the bed, where she was this morning. I drank all day yesterday, which was a Wednesday, bathed her, put the clothes on her, and that she has on now. I noticed early this morning that she was not breathing, and I called the Fire Department. Question from Detective Humphrey: Robert, was Alma breathing or talking yesterday, which is Wednesday? His answer was: Yes, she talked to me yesterday, but she was still drunk and I did not have any heat in the room, and I turned on the heat. Question: How long did she lay out in the yard after you beat her? Answer: She stayed out in the yard for hours. Question: When you took her inside and put her in the bathroom, did you undress her then and change her clothes? Answer: No, I just lay her down in the floor, and a long while later I went back and bathed her off and changed her clothes and put her to bed. I then laid down beside her and woke up this morning and she was cold, and I jumped up and ran outside and used the phone and called the Fire Department and told them to come to my house, and I thought my wife was dead, and I would wait outside for them, and I did. And they went in, and they called the Police Department. Question: What did you beat her with? Answer: Just my fists, I think. I kicked her several times also. Question: Have you ever beat her before? Answer: Yes, I have, and I have got her out of another man’s house not too long ago. Question: Are you and Alma Jean married? Answer: No, we are just common-law. Question: Mr. Lambert, have you been drinking this morning? Answer: No, I finished drinking last night about midnight. Question: Do you know what you are doing, you know what you are doing now, don’t you? Answer: Yes, sir, I know what I am saying or doing, and I am not nowhere near drunk. Question: Robert, have you told me the truth about what happened? Answer: Yes, sir, I have.
“Q. Is anything else on the statement?
“A. Yes, sir. It says: I, Robert Lambert, have read the above statement which is on two pages, and it is the truth to the best that I can remember, and I make this statement freely and voluntarily to Detective C. Humphrey and I freely sign my name, and I have not had any threats or promises made to me.”
Appellant was the only witness in his behalf. He related the events leading up to calling the paramedics. He admitted beating his wife but he denied hitting her with a softball or baseball bat. He stated that when he got home with his wife they started fighting and both fell out of the car and continued to fight. He claimed that he was drunk and that he had a half of a case of whiskey in the car and that his wife did not drink any of it. He denied dragging her into the house but said that he aided her to get inside the house and to the bathroom where he bathed her and put her in the bed.
The investigating officer denied that appellant was drinking at the time they interviewed him and at the time he made the confessory statement.
The only issue raised on this appeal concerns the officers removing the items from appellant’s home without a search warrant.
Appellant did not file a motion to suppress the evidence removed from his home and he did not object to the introduction of these items into evidence.
In Harris v. State, Ala.Cr.App., 347 So.2d 1363, this Court held:
“Title 15, § 389, Code of Alabama 1940, requires that this court must ‘consider all questions apparent on the record or reserved by bill of exception (now transcript of the evidence) and must render such judgment as the law demands’. This statute does not mean that in a case of this kind a review will be made of *778 questions which were not properly raised in the trial court. Kendrick v. State, 55 Ala.App. 11, 312 So.2d 583 (1975) and cases cited at 55 Ala.App. 17, 312 So.2d 583; 7 Alabama Digest, Criminal Law, <s=» 1028. Review on appeal is limited to a consideration of questions properly raised in the trial court. Knox v. State, 38 Ala.App. 482, 87 So.2d 671 (1956); Handley v. State, 214 Ala. 172, 106 So. 692 (1926). Matters not objected to in the trial court cannot be considered for the first time on appeal since review on appeal is limited to those matters on which rulings are invoked at nisi prius. Daniels v. State, 53 Ala.App. 666, 303 So.2d 166 (1974); Shiver v. State, 49 Ala.App. 615, 274 So.2d 644 (1973); Cooper v. State, Ala.App., 331 So.2d 752, cert. denied, Ala., 331 So.2d 759 (1976). Even constitutional rights have to be raised seasonably in the trial court in order to be considered on appeal. Fuller v. State, 269 Ala. 312, 113 So.2d 153 (1959); Steele v. State, 289 Ala. 186, 266 So.2d 746 (1972).”
The legality of a search cannot be considered for the first time on appeal. Woodward v. State, 52 Ala.App. 524, 294 So.2d 772.
In Retowsky v. State, Ala.Cr.App., 333 So.2d 193, this Court stated:
“Clearly the authorities which are construed under the provisions of Title 15, Section 154, Code of Alabama 1940, permit an officer to make an investigation where, as here, he has been notified of the commission of a felony and enters the scene unaccompanied by a warrant.”
The evidence was sufficient to sustain the trial court’s finding that defendant’s confession to murder was voluntary and not induced by intoxication. Balentine v. State, Ala.Cr.App., 339 So.2d 1063; Stewart v. State, 49 Ala.App. 681, 275 So.2d 360.
Photographs of the deceased and the locus in quo are admissible in murder prosecutions when they shed light upon the character and location of the wounds on the victim’s body and the proper predicate has been laid. Balentine v. State, supra.
There is no error in the record and the judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.