JOINER, Judge.
David Martin Mogil appeals his conviction for aggravated cruelty to an animal, see § 13A-11-14.1, Ala. Code 1975, and his sentence of 10 years’ imprisonment! The trial court split that sentence to' time served followed by supervised probation.[1] The trial court ordered Mogil to. pay a $1,000 fine, a $262.50 bail-bond fee, and a $50 crime victims’ compensation assessment.
The State’s evidence at trial tended to show the following. James Wright, the owner of Grady Electrical Contractors, testified that, on November 19, 2014, he and two employees, Brian Roberts and Donald Pippen, were working at Rack and Roll Billiards in Anniston. Wright explained that Rack and Roll Billiards is adjacent to a -restaurant named Damn Yankees, and a second-story balcony with a solid-wall railing is located directly above the back,,entrance to Damn Yankees. Although Wright had never heard any dogs on the balcony, he had seen dogs peek their heads over the railing.
When Wright arrived at Rack and Roll Billiards at approximately 7:30 a.m., Pip-pen was standing outside, and he and Pip-pen “heard an animal yelping and hollering.” Mogil was standing on the balcony cursing and “pretty much just hollering and making a lot of movement.” Wright described Mogil’s movement as “kicking something” and “an erratic movement in a very angrily [sic] manner.” Mogil eventually went inside, and Wright and his employees continued their work inside Rack and Roll Billiards.
Wright left the work site for approximately 30 minutes, and, when he returned, he found Pippen standing outside again. Wright testified, “I heard the dog hollering again, and I seen the hose being slung toward the dog, you know, and going in a downward motion several times.” Wright could see' Mogil from the waist up, and he observed Mogil swinging a water hose “over his shoulder and then back to the ground.” Wright testified that he heard a dog “hollering like crazy” and that “[i]t was a little worse this time. It was yelping *213 and screaming and hollering, and it went away again because [Mogil] went back inside.” Wright stated that, when Mogil returned to the balcony, “[Mogil] started toward the dog, and he bailed out.” Wright observed the dog jump off the balcony; he stated that the dog “hit like this-little table thing and it fell-. It just laid there. Its legs were moving for a minute. I assumed that the dog might have died right then. I didn’t know because I never seen it get back up.”
Wright went back inside-Rack and Roll Billiards because a security guard from a nearby bank had also witnessed the incident, and Wright assumed the security guard would take control of the situation. Wright eventually spoke with the security guard because Wright’s employees were upset, and the security guard left the. area to notify a police officer of the incident. Wright then testified:
“I went back inside working again, and it wasn’t a couple of minutes later and Dave [Mogil] comes in. When Dave comes in, he just comes straight in, and I guess he didn’t know who he was talking to. He came straight up to me, and he was hollering, ‘I didn’t hit that dog.’ And I said, ‘Dave, ,1 seen you hit that dog.’ And then he just put his hand out and said, ‘Well, it bit me.’ I said, ‘So now you’re saying it bit you because you obviously hit it.’ He got really aggravated because of my questioning and the fact that I saw it, and I told him I saw it.”
(R. 118.)
Donald Pippen testified that he, was working for Grady Electrical Contractors at Rack and Roll Billiards on the morning of November 19, 2014. When Pippen arrived, he heard a dog yelping as if it was hurt, and he observed Mogil “hitting a cocker spaniel with a push broom.” Pippen clarified that Mogil was not hitting the dog hard; he explained that the dog was on the balcony railing and that Mogil was attempting to get the dog off the railing and back onto the balcony. Pippen stated that the dog was clearly frightened but that he did not. believe Mogil’s hitting- it with the broom was the cause of its yelping.
Pippen and Roberts started their work inside Rack and Roll Billiards, and Wright eventually left to purchase material. When Wright returned, Pippen was outside watching Mogil swing' a water hose. Pip-pen could not see the dog, but he could hear it yelping. Pippen stated, “He hit the dog. I know he hit the dog because it was hollering.” Pippen testified:
“We kept observing. I went over to Jamie [Wright’s] truck, and I was telling Jamie what was going on. Jamie got kind of irate, but he went inside, and he said leave him alone and let him do what he is doing, whatever. At that point, Jamie went inside. I came back out. Me and Brian Roberts came back out, and the dog was up on the balcony. Dave was out there, you know, hollering, cussing, or whatever. And to be honest, I don’t know if he swung the water hose or not, but I know the dog jumped off the rail onto the pavement down below, like two stories. A dog ain’t just going to jump like that, that far for no reason.”
(R. 143.) After the dog jumped, Pippen saw the dog “bleeding from his mouth laying [sic] on the concrete” and “kicking his little legs.” Pippen testified that Mogil subsequently confronted Wright inside Rack and Roll Billiards. Mogil initially denied hitting the' dog; however, he later admitted hitting the dog because, he said, it bit him. Mogil’s girlfriend eventually arrived and retrieved the dog,
Ross Cash, a security officer at Regions Bank in Anniston, explained that the main entrance to the bank “is right across the *214 alley from Damn Yankees.” Cash testified that, on November 19, 2014, he saw a cocker spaniel he knew as “Coco” jump off the railing of the balcony that is located above Damn Yankees. During the previous two weeks, Cash had regularly talked to the dog and had never before seen her standing on the railing of the balcony. On this morning, however, the dog was “petrified” and was standing on the balcony railing. Cash testified that, when Mogil came out onto the balcony, the dog immediately “jumped to get away from him.” After the dog jumped, it “never showed any signs of movement” until Allison Johnson—whom Cash described as “Coco’s momma”—arrived. Cash testified, “When she saw Allison, it’s like it kicked in. She jumped up and run right to Allison.”
Allison Johnson testified that, on November 19, 2014, she was dating Mogil and had been living with him at the apartment located above Damn Yankees for approximately two weeks. Johnson also kept her pets—a cocker spaniel named Coco Lily, a pug named Rider, and a cat named Bo Kitty—at the apartment. On the morning of the incident, Johnson had been at work for about an hour when Mogil called her and told her to come home. When Johnson arrived, “Officer Cash came up [to her] and said that something had happened to Lil.”[2] Coco Lily ran up to Johnson, and she noticed that the dog was not behaving as it normally did; Coco Lily was bleeding from her mouth, had “used the bathroom on herself,” “had her back tucked down,” and “wasn’t wagging her tail.” Coco Lily followed Johnson to a staircase that leads up to the apartment, but the dog stopped because Mogil was standing at the top of the staircase. Mogil screamed, “[D]o not let that fucking dog in my house,” and threatened to kill Coco Lily. Johnson retrieved a towel from the apartment and cleaned Coco Lily before taking her to the veterinarian’s office. Johnson testified that State’s Exhibit 3, photographs of Coco Lily taken at the veterinarian’s office, showed dark striping on the dog’s coat that was not her natural coloring. After leaving the veterinarian’s office, Johnson took Coco Lily to her ex-husband’s house because she felt the dog would not be safe at Mogil’s residence.
Mogil later explained to Johnson that he was attempting to put the dogs outside on the balcony; because Coco Lily was not moving fast enough, Mogil reached down to pick her up, and she bit his hand. Johnson did not see any visible signs of injury to Mogil’s hand and stated that Coco Lily does not have a history of biting. On the following day, law-enforcement officers questioned Johnson about Coco Lily’s welfare; at Mogil’s instruction, Johnson did not answer any of the officers’ questions.
Dr. Ginger Bailey, a veterinarian at the Southside Pet Clinic, testified that, on November 19, 2014, she examined Coco Lily because, she was told, the dog had jumped off a balcony. Dr. Bailey stated that Coco Lily “had a little bit of blood on her chin” due to an abrasion but that she did not observe any other injuries. According to Dr. Bailey, it is not unusual for a dog that has jumped off a balcony to lack injuries such as bruises or broken bones. Dr. Bailey sent Coco Lily home with antibiotic medication to treat the abrasion and anti-inflammatory medication because she expected the dog to be sore.
Dr. Bailey could not determine whether Coco Lily had been hit with a hose but, in her professional opinion, the act of hitting an animal with a hose absent a life-threatening situation constitutes cruel mistreatment. Dr. Bailey stated that, even if being hit with a hose did not cause a physical *215 injury, it could still cause pain to an animal. Dr. Bailey testified that, hypothetically, a dog that moved slowly but ate normally could be evidence indicating injury resulting either from a fall off a balcony or being struck with a hose.
Sergeant Michael Webb of the Anniston Police Department went to Mogil’s apartment to check on Coco Lily. Mogil informed Sgt. Webb that Coco Lily was not his dog, that she belonged to Johnson, and that he did not know Coco Lily’s whereabouts. Sgt. Webb also questioned Johnson “about how the dog was, where the dog was, what vet it had went to. She refused to answer any of those questions. And I also heard Mr. Mogil at that time say, You don’t have to answer that,’ pretty much to every question that I asked her.” Sgt. Webb obtained an arrest warrant for Mog-il and a search warrant for his apartment. Sgt. Webb testified:
“So we got [the] hose pipe from the rear balcony, and there was nothing else in the apartment. ...
“Allison pulls up in her vehicle to the premises while we are there, and Mr. Mogil had already been arrested and transported from the scene. She wanted to know what we were doing there. Ultimately, her vehicle became part of the search warrant at the residence. And that is where—inside her vehicle is where we found the invoice. ...
[[Image here]]
“We found [the invoice] which was our first lead as to where the dog went to be treated and what time. That was the first that we had of any of that information.”
(R. 257.) Approximately six days after the incident, Jason Barrett, Johnson’s ex-husband, contacted Sgt. Webb and informed Sgt. Webb that Coco Lily was at his house. Sgt. Webb went to Barrett’s house, and Barrett informed Sgt. Webb that Coco Lily was taking pain medication and was moving slowly.
Eric Star, a jail administrator at the Calhoun County Jail, testified that, except for conversations between inmates and their attorneys, telephone calls from the jail are recorded. The State then played audio-recorded excerpts from telephone calls Mogil made while incarcerated at the jail. The excerpts consisted of Mogil stating the following: (1) that he spanked the dog; (2) that he tried to spank the dog but was unsuccessful; (3) that he yelled and cussed at the dog; (4) that he did not torture the dog; (5) that the dog had a history of biting; and (6) that the dog had bit him on four or five previous occasions.
After the State rested, Mogil moved for a judgment of acquittal on the ground that the State had not made a prima facie case of aggravated cruelty to an animal or the lesser-included offense of cruelty to an animal. The trial court denied his motion. After the defense rested, Mogil renewed his motion, and the trial court again denied his motion. During the trial court’s oral charge, the court instructed the jury with respect to aggravated cruelty to an animal as well as the lesser-included offense of cruelty to an animal. The jury ultimately found Mogil guilty of aggravated cruelty to an animal.
Following his conviction and sentencing, Mogil filed a motion for a new trial and a motion for a judgment of acquittal. In each motion, Mogil argued, among other issues, that the State failed to present sufficient evidence to sustain his conviction. The trial court denied his motions.
On appeal, Mogil contends that the trial court erred when it denied his motions for a judgment of acquittal and his motion for a new trial because, he says, the State failed to present sufficient evidence to sustain his conviction or a convic *216 tion for the lesser-included offense of cruelty to an animal.
“ ‘In determining the sufficiency of the evidence to sustain the conviction, .this Court must accept as true the evidence introduced by the State, accord. the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.’ Faircloth v. State, 471 So.2d 485, 489 (Ala. Cr. App. 1984), affirmed, Ex parte Faircloth, [471] So.2d 493 (Ala. 1985).

(( i

“‘ “The role of appellate courts is not to say what the facts are. Our- role, ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury.” Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978). An appellate court may interfere with the jury’s verdict only where it reaches “a clear conclusion that the finding and judgment are wrong.” Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962).... A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). “[WJhere there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense.” Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).’ Granger [v. State], 473 So.2d [1137,] 1139 [ (Ala. Crim. App. 1985) ].
“,.. ‘Circumstantial evidence alone is enough'to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.’ White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). ‘Circumstantial evidence is in nowise considered inferior evidence and is entitled to the. same weight as direct evidence provided it points to the guilt of the accused.’ Cochran v. State, 500 So.2d 1161, 1177 (Ala. Cr. App. 1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala. 1985).”
White v. State, 546 So.2d 1014, 1017 (Ala. Crim. App. 1989). Furthermore,
“ ‘Circumstantial evidence is not inferior evidence, and -it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing unequivocally to the defendant’s guilt. Ward v. State, 557 So.2d 848 (Ala. Cr. App. 1990). In reviewing a conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. Cumbo v. State, 368 So.2d 871 (Ala. Cr. App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979).’
“Wardr v. State], 610 So.2d[ 1190,] 1191-92 [(Ala. Crim. App. 1992)].”
Lockhart v. State, 715 So.2d 895, 899 (Ala. Crim. App. 1997).
The indictment against Mogil reads as follows;
“The Grand Jury of Calhoun County charge that, before the finding of this indictment, David Martin Mogil, whose true name to the Grand Jury is otherwise unknown, did, on,or about November 19, 2014, subject an animal- to cruel mistreatment which involved the , infliction of torture to the animal, in violation *217 of Section 13A-11-14.1 of the Code of Alabama, against the peace and dignity of the State of Alabama.”
Section 13A-11-14.1, Ala. Code 1975, provides, in relevant part:
“(a) A person commits the crime of aggravated cruelty to animals if the person intentionally or knowingly violates Section 13A-11-14, and the act of cruelty or neglect involved the infliction of torture to the animal.
“(b) The word torture as used in this section shall mean the act of doing physical injury to an animal by the infliction of inhumane treatment or gross physical abuse meant to cause the animal intensive or prolonged pain or serious physical injury, or by causing the death of the animal.”
Section 13A-11-14(a)(1), Ala. Code 1975, provides, in relevant part, that “[a] person commits the crime of cruelty to animals if, except as otherwise authorized by law, he or she recklessly or with criminal negligence ... [sjubjects any animal to cruel mistreatment.”[3] Section 13A-2-2, Ala. Code 1975, defines the following terms:
“(1) INTENTIONALLY. A person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his purpose is to cause that result or to engage in that conduct. .
“(2) KNOWINGLY. A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of that nature or that the circumstance exists.
“(3) RECKLESSLY. A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. ...
“(4) CRIMINAL NEGLIGENCE. A person acts with criminal negligence with respect to a result or to a circumstance which is. defined by statute as an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation. ...”
The commentary to § 13A-2-2 states:
“In § 13A-2-2, ‘intentionally’ (subdivision (1)) and ‘knowingly' (subdivision (2)) are largely self-explanatory; further elaboration would entail semanticizing.
“ ‘Recklessly' (subsection (3)) and ‘criminal negligence’ (subsection (4)) are more difficult. A' common denominator in both is that in each instance the underlying conduct must involve a ‘substantial and unjustifiable risk’ that a result or circumstance described in the penal statute will occur or exists. The reckless offender is aware of the risk and ‘consciously disregards’ it. On the *218 other hand, the criminally negligent offender is not aware of the risk created (‘fails to perceive’) and, therefore, cannot be guilty of consciously disregarding it. Thus, his culpability, though less than that of the reckless offender, is greater than that required for ordinary tort, or civil, negligence. The ‘substantial and unjustifiable’ character of the risk involved and the requirement of ‘gross deviation’ from the ordinary standard of care further distinguish the criminal from the mere tortfeasor.”
To establish aggravated cruelty to an animal pursuant to § 13A-11-14.1, the State first had to show that Mogil committed the underlying misdemeanor offense of cruelty to an animal pursuant to § 13A-11-14 by subjecting Coco Lily to cruel mistreatment either recklessly or with criminal negligence. Dr. Bailey, Coco Lily’s veterinarian, testified that striking a dog with a rubber hose absent a life-threatening situation amounts to cruel mistreatment. Wright and Pippen testified that they witnessed Mogil swinging a rubber hose above his head and down to the ground, that they heard a dog yelping, and that the yelping coincided with Mogil’s swinging the hose down. Johnson testified that photographs of Coco Lily taken at the veterinarian’s office showed dark striping on the dog that was not its natural coloring.
Accepting as true the evidence introduced by the State, according the State all legitimate inferences therefrom, and considering the evidence in the light most favorable to the prosecution, the State presented sufficient evidence that Mogil recklessly subjected Coco Lily to cruel mistreatment by striking her with a water hose.[4] The jury could reasonably have found that Mogil was either aware or should have been aware that striking a dog with a water hose absent a life-threatening situation risked subjecting the animal to cruel mistreatment and that Mogil disregarded that risk. See Caldwell v. State, 615 So.2d 1280, 1283 (Ala. Crim. App. 1993)(“The reckless actor is aware of the risk and disregards it.”). Accordingly, the issue of Mogil’s guilt of the underlying offense of cruelty to an animal pursuant to § 13A-11-14 was properly submitted to the jury, and the jury might reasonably have concluded that the State’s evidence excluded every hypothesis except that of Mogil’s guilt.
To establish the felony offense of aggravated cruelty to an animal, the State next had to show that Mogil’s act of cruelty—striking Coco Lily with a water hose— involved the infliction of torture to Coco Lily. As applied to the facts of this case, the State had to show that Mogil tortured Coco Lily by physically injuring her by the infliction of inhumane treatment or gross physical abuse meant to cause her intensive or prolonged pain or serious physical injury. Section 13A-1-2, Ala. Code 1975, defines “physical injury” as “[i]mpairment of physical condition or substantial pain.” The State, however, failed to present any evidence indicating that Coco Lily suffered physical injury solely as a result of Mogil striking her with a water hose. Although Dr. Bailey testified as to injuries that Coco Lily could have hypothetically suffered as a result of being hit with a water hose, there was no direct or circumstantial evidence indicating that Coco Lily suffered physical injury because Mogil hit her with the hose. Moreover, the State’s evidence *219 that Coco Lily suffered physical injury as a result of jumping from the balcony was not sufficient because that incident could not have served as the basis for the underlying conviction of cruelty to an animal required to sustain Mogil’s conviction for aggravated cruelty to an animal. As noted above, Mogil did not subject Coco Lily to cruel mistreatment when he walked onto the balcony before Coco Lily jumped from that balcony. Therefore, the jury could not have reasonably concluded that the State’s evidence excluded every hypothesis except that of Mogil’s guilt—specifically, that Coco Lily’s physical injuries resulted from Mogil striking her with a water hose. Accordingly, the State did not present legally sufficient evidence to sustain Mogil’s conviction for aggravated cruelty to an animal; that conviction, therefore, is due to be reversed, and a judgment of acquittal is due to be rendered in Mogil’s favor as to that charge. As noted above, however, the State did present sufficient evidence to support a conviction of cruelty to an animal pursuant to § 13A-11-14, Ala. Code 1975.
Based on the foregoing, we reverse the judgment of the trial court and render a judgment of acquittal as to Mogil’s aggravated-cruelty-to-an-animal conviction. Furthermore, we remand this case to the trial court for that court to adjudge Mogil guilty of the lesser-included offense of cruelty to an animal and to resentence Mogil accordingly.
REVERSED; JUDGMENT OF ACQUITTAL RENDERED; AND REMANDED.
Windom, P.J., and Welch and Burke, JJ., concur. Kellum, J., not sitting.

. Mogil was given 223 days of jail credit and was ordered to serve 9 years, 142 days of probation.

. Johnson testified that she referred to Coco Lily as "Lil.”

. Regarding the underlying offense of cruelty to an animal, the trial court charged the jury .with respect to subsections (a)(1) and (a)(3). The indictment, however, tracks the language of § 13A-11-14(a)(1) only, and the trial court adjudicated Mogil guilty "as charged in the indictment.” (R. 440.) Therefore, we do not address whether the State presented sufficient evidence that Mogil committed cruelty to an animal under § 13A-11-14(a)(3), Ala. Code 1975.

. We note that the State presented no evidence indicating that Mogil subjected Coco Lily to cruel mistreatment when Coco Lily jumped from the balcony. Indeed, the State concedes in its brief that “[t]he beating of the dog with the water hose is the basis for affirming the [aggravated-cruelty-to-an-animal] conviction.” (State’s brief, p. 40.)